# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TWIN CITIES PIPE TRADES WELFARE FUND, individually and on behalf of all others similarly situated, | Case No.  16-1534 (CMR) |
| Plaintiff, | **CLASS ACTION AMENDED COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| Lannett Company, Inc., Impax Laboratories, Inc., West-Ward Pharmaceuticals Corporation, Allergan plc; Mylan Pharmaceuticals, Inc., and Par Pharmaceutical Companies, Inc. | |
| Defendants. | |

# INTRODUCTION

Plaintiff Twin Cities Pipe Trades Welfare Fund ("Pipe Trades Fund" or "Plaintiff") brings this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price of generic digoxin or doxycycline products manufactured by Defendants during the period from October 1, 2012, to the present and (b) a damages class of persons or entities who purchased, paid and/or provided reimbursement for some or all of the purchase price of generic digoxin or doxycycline products, as defined below, manufactured by Defendants during the

period from October 1, 2012, to the present in the 30 states identified herein and in the District of Columbia. Defendants are accused of engaging in a conspiracy to fix, maintain, and/or stabilize the prices of these generic drug products. All allegations herein are based on information and belief, except for those relating to the Plaintiff.

## JURISDICTION AND VENUE

1.      Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and under the antitrust and common laws of various states for damages and equitable relief.

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, via Section 16 of the Clayton Act, 15 U.S.C. § 26, and via 28 U.S.C. § 1367.

3.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empanelled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here, where Lannett and Mylan are headquartered and where Impax's generics division, Global Pharmaceuticals ("Global"), is located.

4.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold generic digoxin and/or generic doxycycline throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

5.     Plaintiff Twin Cities Pipe Trades Welfare Fund is a Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National Labor Relations Act, with its principal place of business in St. Paul, Minnesota, and an employee welfare benefit plan as defined in Section 3(1) of ERISA.  Pipe Trades Fund is the sponsor of a plan of benefits that is the Pipe Trade Services MN Welfare Plan, which provides health benefits, including prescription drug benefits, to approximately 16,000 active participants and retirees, plus their spouses and dependents.  Pipe Trades Fund purchased and/or provided reimbursement for some or all of the purchase price of generic digoxin and generic doxycycline manufactured by one or more Defendants, other than for re-sale, in Minnesota, among other locations, during the Class Period, at supra-competitive prices.  As a result of the alleged conspiracy, Plaintiff was injured in its business or property by reason of the violations of law alleged herein.

6.      Defendant Lannett is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania. Lannett is a distributor of generic digoxin and generic doxycycline. During the Class Period, Lannett sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

7.      Defendant Impax is a Delaware corporation that has its principal place of business in Hayward, California. Impax's generics division is called Global Pharmaceuticals and is a manufacturer and distributor of generic digoxin. During the Class Period, Global sold generic digoxin to customers in this District and other locations in the United States.

8.      Defendant Par is a Delaware corporation with its principal place of business in Chestnut Ridge, New York. In January 2014, Par announced that it had entered into an exclusive United States supply and distribution agreement with Covis Pharma S.à.r.l. ("Covis") to distribute the authorized generic version of Covis's Lanoxin® (digoxin) tablets. At that time, Par began selling and shipping 0.125 mg and 0.250 mg strengths of digoxin tablets in this country. Par also manufactures generic doxycycline. During the Class Period, Par sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

9.      Defendant West-Ward is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company and is a manufacturer and distributor of generic digoxin.

During the Class Period, West-Ward sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

10.   Defendant Allergan is an Irish corporation that has its global headquarters in Dublin, Ireland and its administrative headquarters in Parsippany-Troy Hills, New Jersey. During the Class Period, Allergan sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

11.   Defendant Mylan is a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania. During the Class Period, Mylan sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

12.   Various other persons, firms, corporations and entities not currently named as Defendants in this action have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

13.   At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

14.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

15.     During the Class Period, Defendants sold substantial quantities of generic digoxin and/or generic doxycycline in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

## FACTUAL ALLEGATIONS

*The Industry*

16.     The claims in this case arise from a broad conspiracy among manufacturers of generic drugs to fix the prices charged for those drugs in recent years. The conspiracy appears to have been effectuated by direct company-to-company contacts among generic drug manufacturers, as well as joint activities undertaken through trade associations such as the generic Pharmaceutical Association ("GPHA"). The unlawful acts undertaken with respect to generic digoxin and doxycycline are merely two manifestations of that overall conspiracy.

17.     In 2014, the Antitrust Division of the United States Department of Justice ("DOJ") began a criminal investigation of this conspiracy and has caused grand jury subpoenas to be issued to various Defendants in connection with this investigation. The investigation encompasses generic drugs other than digoxin and doxycycline and, as the scope of the DOJ's investigation is further clarified, Plaintiff reserves the right to amend its complaint to add more parties and claims.

18.     The entire purpose of permitting a generic drug industry in the United States was to encourage the manufacture of less expensive, non-branded substitutes for branded prescription drugs that either had no patent exclusivity or for which the patent exclusivity was expiring. According to a March 12, 2015, Powerpoint presentation by Defendant Lannett, eight out of ten prescriptions filled are for generic drugs. According to that presentation, this is because the United States healthcare system focuses on "cost saving," thereby "increasing demand for cheaper generic drugs."[1] In a January 2012 report, the Government Accounting Office noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[2]

19.     As reflected in a chart compiled by Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform and Senator Bernie Sanders, Chair of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, prices for digoxin and doxycycline                     increased                     dramatically                     in

---

[1]*See*  https://www.business.illinois.edu/finance/rcmp/research/LCI2015-3.pptx.
[2] *See* http://www.gao.gov/assets/590/588064.pdf.

2013:[3]

| Drug | Use | Average Market Price Oct. 2013 | Average Market Price April 2014 | Average Percentage Increase |
|---|---|---|---|---|
| Doxycycline Hyclate (bottle of 500, 100 mg tablets) | antibiotic used to treat a variety of infections | $20 | $1,849 | 8,281% |
| Albuterol Sulfate (bottle of 100, 2 mg tablets) | used to treat asthma and other lung conditions | $11 | $434 | 4,014% |
| Glycopyrrolate (box of 10 0.2 mg/mL, 20 mL vials) | used to prevent irregular heartbeats during surgery | $65 | $1,277 | 2,728% |
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | used to prevent migraines and treat certain types of seizures | $31 | $234 | 736% |
| Pravastatin Sodium (bottle of 500, 10 mg tablets) | used to treat high cholesterol and to prevent heart disease | $27 | $196 | 573% |
| Neostigmine Methylsulfate (box of 10 1:1000 vials) | used in anesthesia to reverse the effects of some muscle relaxants | $25 | $121 | 522% |
| Benazepril/Hydrochlorothiazide (bottle of 100, 20-25 mg tablets) | used to treat high blood pressure | $34 | $149 | 420% |
| **Drug** | **Use** | **Average Market Price Nov. 2012** | **Average Market Price Sept. 2014** | **Average Percentage Increase** |
| Isuprel (box of 25, 0.2 mg/mL vials) | used to treat heart attacks and irregular heartbeat | $916 | $4,489 | 390% |
| Nitropress (50 mg vial) | used to treat congestive heart failure and reduce blood pressure | $44 | $215 | 388% |
| **Drug** | **Use** | **Average Market Price Oct. 2012** | **Average Market Price June 2014** | **Average Percentage Increase** |
| Digoxin (single tablet, 250 mcg) | used to treat irregular heartbeats and heart failure | $0.11 | $1.10 | 884% |

20.     Digoxin is used to treat mild to moderate heart failure in adults, increase the heart contracting functions for pediatric patients with heart failure, and control the resting heart rate in adult patients with chronic atrial fibrillation. It is derived from the leaves of a digitalis (or foxglove) plant and was first described in medical literature around 1785. Digoxin helps an injured or weakened heart pump blood more efficiently and strengthens the force of the heart muscle, which helps to restore a normal, steady

---

[3] *See* http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

heart rhythm. It is on the World Health Organization's ("WHO") list of essential medicines.[4] Digoxin must be taken daily and exactly as prescribed in order to be effective, and failure to take digoxin as prescribed can have catastrophic consequences. According to data from IMS Health, annual sales of digoxin in the United States are approximately $44 million as of the beginning of 2014. As indicated in the discussion below, those sales numbers increased dramatically in 2014 and 2015. As used herein, the term "digoxin" is intended to refer to doses of digoxin taken orally in the form of a tablet or capsule.

21.    Doxycycline monohydrate is an antibiotic used in treating humans and animals. It is useful for bacterial pneumonia, acne, chlamydia infections, Clostridium difficile colitis, early Lyme disease, cholera and syphilis. It is also useful for the treatment of malaria when used with quinine and for the prevention of malaria. It also is on WHO's previously referenced list of essential medicines. Doxycycline hyclate is a variation of doxycycline monohydrate that entered the market in 1985. As used herein, the term "doxycycline" refers to both doxycycline monohydrate and doxycycline hyclate in tablet or capsule form, unless otherwise indicated.

22.    Many patients with cardiovascular conditions need to take digoxin daily in order to survive. Likewise, people with serious infections or other life-threatening diseases need access to a ready, affordable supply of doxycycline.

---

[4] *See* http://www.who.int/selection_medicines/committees/expert/20/EML_2015_FINAL_amended_AUG2015.pdf?ua=1.

23.     Defendants Lannett Company, Inc., Impax Laboratories, Inc., West-Ward Pharmaceuticals Corp., Mylan Pharmaceuticals, Inc., and Par Pharmaceutical Companies, Inc. manufacture and/or distribute generic digoxin. These Defendants collectively sell tens of millions of dollars' worth of digoxin every year in the United States. Lannett, West-Ward, Par and Mylan also manufacture generic doxycycline. Another major supplier of generic doxycycline has been the Actavis unit of Defendant Allergan plc.[5] On March 17, 2015, Actavis plc completed its acquisition of Allergan, Inc. As part of the transaction, Actavis plc changed its name to Allergan plc ("Allergan"), the entity named as a Defendant herein.

24.     The markets for generic digoxin and generic doxycycline are oligopolies. Thus, in the generic digoxin market, mergers and withdrawals from the market caused the number of competitors to shrink drastically. By October 2013, the generic digoxin market was essentially a duopoly controlled by Lannett and Impax. Defendant West-Ward, a subsidiary of Hikma Pharmaceuticals PLC, is also a competitor, but it had to suspend operations in November 2012 in the wake of an investigation by the United States Food & Drug Administration ("FDA") into production problems at its manufacturing facility. It resumed participation in the generic digoxin market in July

---

[5] *See*
http://www.allergan.com/Actavis/media/PDFDocuments/2013_US_Rx_Product_Catalog.pdf.
The predecessor to Actavis plc also manufactured a generic form of digoxin at plants in New Jersey, but in December 2008, it agreed to cease doing so after the DOJ sued it for violating the FDA's manufacturing regulations.
http://www.law360.com/articles/81363/correctionactavis-to-halt-production-at-3-plants.
The company no longer sells generic digoxin in the United States.

2013. Mylan and Par entered that market in 2014 and 2015, respectively. Similarly, Par, West-Ward, Mylan, Allergan and Lannett are also major players in the market for generic doxycycline.

25.    Defendants' dramatic and unexplained price hikes have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators. In a January 8, 2014, letter to members of key committees of the United States House of Representatives and Senate, Douglas P. Hoey, Chief Executive Officer of the National Community Pharmacists' Association, asked Congress to conduct an investigation of generic drug price increases.[6] On October 2, 2014, Senator Sanders and Representative Cummings sent letters to Actavis, Lannett, Impax, Mylan, and West-Ward (hereinafter referred to as the "October Letters") asking for detailed information on the generic digoxin and/or generic doxycycline hyclate price hikes, among others.[7]

26.    On November 20, 2014, the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs. Although Bedrosian, the CEO of Lannett, was invited to testify, neither he nor any other chief executive of a generic drug manufacturer did so.[8]

---

[6] *See* https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf.
[7] The October Letters are available at
http://www.sanders.senate.gov/newsroom/pressreleases/congress-investigating-why-generic-drug-prices-are-skyrocketing.
[8] *See* http://www.sanders.senate.gov/newsroom/press-releases/drugmakers-mum-on-huge-price-hikes.

27.    Antitrust regulators have also been actively investigating the price hikes. In August 2014, the Connecticut Attorney General opened an antitrust investigation into digoxin pricing. Lannett, Impax and Par were subpoenaed concerning a conspiracy to restrain trade by fixing the price of digoxin or allocating and dividing customers or territories. The subpoena confirms that digoxin pricing is at the heart of the investigation.

28.    By November 3, 2014, as noted above, the DOJ had opened a criminal grand jury investigation into the pricing of various generic drugs, including generic digoxin and generic doxycycline. To date, according to statements in public filings with the Securities & Exchange Commission ("SEC") discussed below, the grand jury has issued subpoenas to Lannett and Lannett's Vice-President of Sales and Marketing (believed to be Kevin Smith, according to Lannett's website);[9] Impax and an unidentified sales representative of Impax; Allergan; Par; and Mylan.

29.    According to the FDA's Glossary, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[10] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product." *Id*. According to a Powerpoint presentation given by Lannett at the 2014 Bank of America/Merrill Lynch Healthcare Conference, the cost of generics is "[o]ften 80-85% less than the brand."

---

[9]*See* http://www.lannett.com/about-lannett-management.php.

[10] *See* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

30.     Due to the price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute the generic drug when presented with a prescription for the branded drug. Since passage of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 68b-68c, 70b; 21 U.S.C. §§ 301 note, 355, 360cc; 28 U.S.C. § 2201; 35 U.S.C. §§ 156, 271, 282)), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

31.     Plaintiff alleges that during the Class Period, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize prices at which generic digoxin and generic doxycycline would be sold. As a result of Defendants' unlawful conduct, Plaintiff and the other members of the proposed Classes paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for generic digoxin and generic doxycycline.

*Market for Generic Digoxin*

32.     The market for generic digoxin is mature and the Defendants in that market can only gain market share by competing on price.

33.     Lanoxin® is a branded version of digoxin. It was formerly a registered trademark of GlaxoSmithKline ("GSK"), which in December 2011 sold its commercial rights in Lanoxin to Covis. Currently, Lanoxin® is manufactured by DSM Pharmaceuticals, Inc. and distributed by Covis. As discussed previously, in January

2014, Par contracted with Covis for distribution rights for an authorized generic version of Lanoxin® in the United States.

34.   According to the 2015 edition of the FDA's Orange Book, the .250 mg strength of Lanoxin® is a reference listed drug ("RLD"). An RLD is an "approved drug product to which new generic versions are compared to show that they are bioequivalent," that is, the generic version "performs in the same manner as the Reference Listed Drug."[11] A drug company seeking approval to market a generic equivalent must refer to the Reference Listed Drug in its Abbreviated New Drug Application. *Id.* Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the RLD, an applicant may manufacture and market the generic drug product to provide a safe, effective, low cost alternative to the American public. *Id.*

35.   Furthermore, the FDA will generally assign a Therapeutic Equivalence Code ("TE Code") of AB to those products it finds to be bioequivalent.[12] This coding system allows users to quickly determine important information about the drug product in question.[13] For example, the FDA states that "[p]roducts generally will be coded AB if a study is submitted demonstrating bioequivalence. Even though drug products of distributors and/or repackagers are not included in the List, they are considered

---

[11] The FDA's Glossary is available at
http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#RLD.
[12] *See*
http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.
[13] *See* http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#TEC.

therapeutically equivalent to the application holder's drug product if the application holder's drug product is rated AB."[14]

36.     Lanoxin® in tablet form has TE Code of "AB." As the FDA has listed in its Orange Book with regard to Therapeutic Equivalents for Lanoxin®, current generic equivalents which share the code AB are those distributed by Lannett; Global, a division of Impax; West-Ward; Par; Mylan; and Caraco Pharmaceutical Laboratories, Ltd., which is a subsidiary of Sun Pharmaceutical Industries, Ltd., an Indian company.

37.     According to its Form 10-K filed with the SEC on August 27, 2015,[15] Lannett has been involved in the business of generic digoxin distribution since at least March 2004, when Lannett entered into a supply agreement with Jerome Stevens Pharmaceuticals ("JSP") for the exclusive distribution rights in the United States to generic digoxin and two other drugs manufactured by JSP. As reflected in the aforementioned Form 10-K, this agreement was made in exchange for four million shares of Lannett's common stock. Lannett and JSP thereafter amended the original agreement to extend the initial contract for five more years (until March 2019). As further reflected in the Form 10-K, for additional consideration, Lannett issued JSP 1.5 million shares of Lannett common stock, valued at approximately $20.1 million.

38.     Lannett markets and distributes two potencies of generic digoxin: 0.125 mg and 0.250 mg. They both have a TE Code of AB and therefore are generic

---

[14] *See* http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.
[15] *See* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

equivalents to the corresponding respective strengths of Lanoxin®. As reflected in Form 10-Ks from 2011-14, Lannett's sales of generic digoxin totaled $12.4 million in 2011; $10.9 million in 2012; $11.7 million in 2013; and $54.7 million in 2014.

39.     By October 2013, the generic digoxin market was essentially a duopoly controlled by Lannett and Impax. Defendant West-Ward was also a competitor, but had suspended operations in November 2012 in the wake of the FDA investigation described above, and did not resume participation until July 2013.

***Market for Generic Doxycycline***

40.     The market for generic doxycycline is mature and the Defendants in that market can only gain market share by competing on price.

41.     The primary actors in that market are Allergan, Lannett, Par, West-Ward and Mylan, who collectively control a commanding market share.

42.     As with generic digoxin, generic doxycycline hyclate in capsule form almost universally has a TE Code of AB and the RLD is Pfizer's Vibramycin®. Doxycyline monohydrate in capsule or tablet form also almost universally has a TE Code and its RLD is listed as a generic form of the drug.

43.     Total United States retail sales of doxycycline in 2013 were estimated to be over $972 million.[16]

***Defendants' Pricing Conduct for Generic Digoxin and the Effects Thereof***

44.     Generic digoxin pricing was remarkably stable until approximately mid-October 2013. That stability is reflected in the following chart submitted by Dr. Stephen

---

[16]*See* http://www.drugs.com/stats/doxycycline.

Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony at the Senate Hearing.[17]



Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy: (January 1, 2005 to December 31, 2013)

The terms "AWP" and "WAC" in this chart refer, respectively, to "Average Wholesale Price" and "Wholesale Acquisition Price." Both prices are referred to by Dr. Schondelmeyer as benchmark prices.[18]

---

[17] Dr. Schondelmeyer's testimony is available at
http://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf.
[18] *Id*. at 15.

45.     This chart reflects only a portion of the price hikes for generic digoxin that occurred. The October Letters referenced above noted that prices for generic digoxin increased dramatically between October 2012 and June 2014 for the market as a whole:

| Drug | SKU | Average Market Price, October 2012 | Average Market Price, June 2014 | Cost Increase | Average Percentage Increase |
|------|-----|-----------------------------------|--------------------------------|---------------|----------------------------|
| Digoxin | 125mcg tablet | $.11 | $1.06 | $0.95 | 839% |
| Digoxin | 250mcg tablet | $.11 | $1.10 | $0.99 | 884% |

46.     These astounding price increases were caused by sudden and abrupt pricing changes made by Lannett, West-Ward, and Impax that were followed by Par and Mylan when they entered the market in 2014 and 2015, respectively. In or about November and December 2013, pricing for .125 mg and .250 mg tablets of digoxin increased more than 750%, from $.11 and $.12 per tablet to $.91 and $1.01 per tablet. Between December 2013 and January 2014, the prices of digoxin jumped again to $1.08 and $1.11 per tablet. Daily heart medication that cost 11 or 12 cents per pill in early November 2013 cost nearly ten times more by early January 2014.

47.     Data from the National Average Drug Acquisition Cost ("NADAC") on generic digoxin show price increases that led to identical prices for Lannett's, West-Ward's and Impax's generic digoxin products. The same was true of Par's pricing of generic digoxin in the United States beginning in early 2014 and of Mylan's pricing of generic digoxin when it entered the market in 2015. The following chart shows Lannett's, West-Ward's, Impax's, Par's and Mylan's pricing of the 0.125 mg tablet dosage of generic digoxin during the period from October 2012 to April 2015.



48. The following chart, based on NADAC data, shows Lannett's, West-Ward's, Impax's Par's and Mylan's pricing of the 0.250 mg tablet dosage of generic digoxin during the period from October 2012 to mid-March 2015.



49.    Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage.[19] No supply disruption was reported by the relevant Defendants with respect to digoxin in the fall of 2013. As stated at the website of the Generics and Biosimilars Initiative on August 29, 2014, "[a]t the time of the price increases, the US Food and Drug Administration had reported no drug shortages, there was no new patent or new formulation and digoxin is

---

[19] *See* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

not difficult to make. The companies have not yet provided an explanation for the price rise."[20]

50.    The presence or absence of competitors in the marketplace does not explain the remarkable changes in the prices of generic digoxin. From October 2012 to around November 21, 2013, the NADAC of generic digoxin was consistently around $0.11 for the 0.125 mg tablets and between $0.11 and $0.12 for the 0.250 mg tablets. The chart presented by Dr. Schondelmeyer confirms this. This was the case even though for a portion of that period after West-Ward suspended production, Lannett and Impax were the only significant players in the market. West-Ward returned to the market in July 2013, but pricing still remained stabilized for several months. Indeed, throughout 2012 and through September 2013, as Dr. Schondelmeyer's chart shows, the price of generic digoxin remained steady. Following the astronomical price increases in Fall 2013, Par entered the market in early 2015 and Mylan entered the market in 2015. Prices did not fall despite the addition of new competitors. Pricing has remained inflated to this day.

***Defendants' Pricing Conduct for Generic Doxycycline and the Effects Thereof***

51.    For generic doxycycline, the pattern of huge price increases started in Fall 2012, a year earlier than for generic digoxin.

52.    Dr. Schondelmeyer, in his testimony at the Senate Hearing, presented the following chart showing the sudden increase in West-Ward's pricing for generic

---

[20] http://www.gabionline.net/Generics/General/Lawyers-look-at-new-price-hike-for-old-drug.

doxycycline, the AWP of which went from under $2.50 for a day of therapy for 100mg

capsules of doxycycline hyclate to over $11 by January 2013:



53.     Similarly, Senator Sanders and Representative Cummings noted huge

increases in the price of generic doxycycline in their October Letters:

| Drug | SKU | Average Market Price October 2013 | Average Market Price April 2014 | Cost Increase | Average Percentage Increase |
|---|---|---|---|---|---|
| Doxycycline Hyclate | bottle of 50, 100mg capsules | $4 | $191 | $187 | 5,025% |
| Doxycycline Hyclate | bottle of 50, 100mg tablets | $3 | $191 | $187 | 4,986% |
| Doxycycline Hyclate | bottle of 50, 50mg capsules | $3 | $70 | $67 | 2,191% |
| Doxycycline Hyclate | bottle of 500, 100mg capsules | $27 | $1,849 | $1,822 | 7,105% |
| Doxycycline Hyclate | bottle of 500, 100mg tablets | $20 | $1,849 | $1,829 | 8,281% |

54.   The NADAC data for 50 mg and 100 mg of generic doxycycline hyclate capsules manufactured by Defendants Allergan and West-Ward reveals a similar pattern:





55.   The NADAC data for 100mg of generic doxycycline hyclate tablets manufactured by Allergan and West-Ward likewise illustrates a similar pattern:



There were no reasonable justifications for this abrupt shift in pricing conduct. The FDA did announce that a shortage of doxycycline in January 2013; but that generic drug was placed on the resolved shortage list in October 2013.[21]

56.    The NADAC data for 100mg doxycycline monohydrate tablets manufactured by Lannett, Par, and Mylan during the period from October 2012 through mid-February 2015 is depicted in the following chart; while prices for this dosage reflect more of a sawtooth pattern, again, it is one of a substantial increasing trend.

---

[21] *See* http://www.cdc.gov/std/treatment/doxycyclineShortage.htm.



57.     Defendants' sudden and massive price increases represented a sharp departure from the previous years of moderate and stable prices.

58.     In a fourth quarter 2013 earnings call that occurred on September 10, 2013, CEO Arthur Bedrosian signaled Lannett's intention to increase prices and his expectations that his competitors would follow suit. Discussing the role of Kevin Smith, Lannett's Vice President of Sales and Marketing and one of the persons apparently subpoenaed by DOJ, Bedrosian said:

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process . . . .*I am finding a climate out there has been changed dramatically and I see more price increases coming from our competing—competitors than I've seen in the*

*past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit.*

(Emphasis added).

59.     In a subsequent earnings call, Bedrosian reported that Lannett's chief competitor had heeded its signal to increase prices. In a first quarter 2014 earnings call on November 7, 2013—after the initial generic digoxin price increases—Bedrosian noted, referring to Impax, that "*[w]e've had a recent price increase on the [generic digoxin] product as well because we are now only 1 of 2 people in the market. And as a result, I expect that product to do very well.*" (Emphasis added).

60.     The next quarter, on February 6, 2014—after more price increases on generic digoxin had occurred and after Par had entered the market—Bedrosian said he was not concerned about this new entry: "[a]nd we see Par as one of our rational competitors in the marketplace." He went on to note, "we're not troubled by their pricing in the marketplace. Not at all."

61.     In a quarterly earnings call held on November 3, 2014. Bedrosian again expressed confidence that Lannett would not have to engage in price competition generally in the generic drug market. He said Lannett and its competitors were "*less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell*." (Emphasis added). Bedrosian went on to discuss, *inter alia*, Par and Impax, saying "*the companies we're looking at here are not irrational players. I don't see them just going out and trying to grab market share*." (Emphasis added). He also noted that Mylan was expected to enter the market, "*but Mylan is one of those*

*rational competitors, so we're not really expecting anything crazy from them.*"
(Emphasis added). He predicted that price increases would continue.

62.    On February 4, 2015, in another quarterly earnings call, Bedrosian stated:
"I think you're going to find more capital pricing [in the generic marketplace], more—
I'll say less competition, in a sense. You won't have price wars."

63.    Frederick Wilson, the CEO of Impax, also spoke to the topic of pricing in
a third quarter 2014 earnings call: "we've done what most of the other generic
competitors have done, we look at opportunities, we look at how competition shifts, we
look at where there may be some market movement that will allow us to take advantages
on price increases and we've implemented those . . . ."[22]

64.    This meeting of the minds among the competing sellers of generic digoxin
and generic doxycycline assured them increasing profits. Bedrosian noted in the
February 4, 2015, earnings call that Lannett "recorded the highest net sales and net
income in our company's history." Gross profits in the first six months of the 2015 fiscal
year were $158.8 million or 76% of net sales, compared with $42.3 million or 37% of
net sales during the previous fiscal year. Generic digoxin pricing played a big role in its
success. The 2015 Lannett Presentation noted that generic digoxin accounted for 23% of
company revenues.

65.    Likewise, according to the 2015 SEC Form 10-K for Impax filed on
February 26, 2015, it had $596 million in total revenues in the 2014 calendar year,

---

[22] *See* http://www.nasdaq.com/symbol/ipxl/call-transcripts.

compared to $511 million in 2013—a 17% increase. One of the primary factors in this growth was "higher sales of our Digoxin".[23]

***Congressional and Regulator Responses***

66.     As noted above, the unseemly profits made by the generic drug manufacturers led to inquiries by Congress and to the Senate Hearing, where numerous witnesses referenced the pricing history summarized above.

67.     Senator Sanders and Representative Cummings followed up on the Senate Hearing by writing a letter on February 24, 2015, to the Office of the Inspector General ("OIG") of the Department of Health & Human Services, asking it to investigate the effect price increases of generic drugs, including generic digoxin, have had on generic drug spending within the Medicare and Medicaid programs.[24] The OIG responded in a letter dated April 13, 2015, saying it planned to engage in a review of quarterly average manufacturer prices for the 200 top generic drugs from 2005 through 2014.[25]

68.     In July 2014, Connecticut Attorney General George Jepsen issued subpoenas to each of the Defendants, saying that there was "reason to believe" that a conspiracy took place "which is for the purpose, or has the effect of, (a) fixing, controlling or maintaining prices, rates, quotations, or fees; or (b) allocating or dividing customers or territories . . . ."

---

[23] *See* http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true.

[24] *See* http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[25] *See* http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

69.     Commencing in November 2014, the DOJ issued grand jury subpoenas to Lannett, Impax, Par, Allergan, and Mylan and, in some cases, their employees. These subpoenas have been acknowledged in SEC filings by all three companies. (It is not publicly known if West-Ward also received a subpoena, because its foreign parent, Hikma, does not make disclosures to the SEC.)

70.     In an SEC Form 10-Q dated February 6, 2015, Lannett has said that on November 3, 2014, "the Senior Vice-President of Sales and Marketing was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[26] The responses to that subpoena led to the issuance of a second grand jury subpoena to Lannett itself. It noted in the same SEC filing that on December 5, 2014, "[t]he Company was served with a grand jury subpoena related to the federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products." A report in Pharmacy Times described the subpoenas as follows:

> The Lannett Company, Inc., subpoena covers 2 specific areas related to antitrust laws and generic drug pricing. The first portion covers a Connecticut Attorney Genera investigation into whether the company or its employees engaged in price fixing, maintaining, or controlling for

---

[26] *See*
http://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=10044800 &type=HTML&symbol=LCI&companyName=Lannett+Co.+Inc.&formType=10-Q&dateFiled=2015-02-06.

digoxin. The second portion serves the company's senior vice president of sales and marketing with a grand jury subpoena pertaining to Sherman antitrust act violations in the generic drug industry. That subpoena requests any documents exchanged with competitors related to the sale of any generic prescription medications during any time period.[27]

Similar statements are contained in Lannett's most recent SEC Form 10-Q, filed on

February 9, 2016.[28]

71.    On August 27, 2015, Lannett filed a new SEC Form 10-K. It contains this

further explanation of the DOJ investigation:

> In fiscal year 2015, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.[29]

Similar statements are contained in Lannett's most recent Form 10-Q, referenced above.

72.    In an SEC Form 10-K dated March 12, 2015, Par stated that "[o]n

December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ

requesting documents related to communications with competitors regarding our

authorized generic version of Covis's Lanoxin® (digoxin) oral tablets."[30] In a Form 10-

---

[27] *See* http://www.pharmacytimes.com/publications/issue/2014/December2014/Senate-Hearing-Investigates-Generic-Drug-Prices.

[28] *See* http://www.sec.gov/Archives/edgar/data/57725/000110465916094983/a15-24119_110q.htm.

[29] *See* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[30] *See* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

Q for the third quarter of 2015, Endo International plc, the parent company for Par, stated that "[o]n December 5, 2014, the Company's subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is cooperating fully with the investigation."[31]

73.     Impax's 2015 Form 10-K referenced above states that "[o]n November 3, 2014, a sales representative of the Company received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury for the Eastern District of Pennsylvania. The request relates to any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications." Subsequently, in an SEC Form 10-Q filed on May 11, 2015, Impax indicated that the "[o]n December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic

---

[31] *See* http://phx.corporate-ir.net/phoenix.zhtml?c=123046&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTEwNTY2NjAwJkRTRQE9MCZTRVE9MCZTUURFU0U0M9U0VDVElPTl9FTlJJUkUmc3Vic2lkPTU3.

version of Covis's Lanoxin® (digoxin) oral tablets and our generic doxycycline products."[32]

74.    On August 6, 2015, Allergan filed an SEC Form 10-Q, in which it disclosed that "[o]n June 25, 2015, the Company received a subpoena from the U.S. Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[33]

75.    On December 4, 2015, Mylan N.V., the parent of Defendant Mylan, issued an SEC Form 8-K that stated "[o]n December 3, 2015, a subsidiary of Mylan N.V. . . . received a subpoena from the Antitrust Division of the U.S. Department of Justice . . . seeking information relating to the marketing, pricing and sale of our generic Doxycycline products and any communications with competitors about such products."[34]

76.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*.[35] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed

---

[32] *See* http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/88fbdd3c-25b3-4640-935d-4c2ced2a6a47.pdf?noexit=true.

[33] *See* https://www.sec.gov/Archives/edgar/data/1578845/000156459015006357/agn-10q_20150630.htm.

[34] *See* http://www.sec.gov/Archives/edgar/data/1623613/000119312515394875/d225442d8k.htm.

[35] The 2014 edition of the *Antitrust Division Manual* is available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

with a criminal prosecution." *Id*. at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division." *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id*. Thus, the fact that Lannett, Impax, Allergan, Mylan and Par or their employees received federal grand jury subpoenas is a strong indicator that antitrust offenses have occurred.

77.    Commentators have also taken note of the criminal subpoenas being issued. As noted on one legal website:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.

> Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year. There does not appear to be any rational explanation for such increases involving a diverse set of products.

The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors.[36]

78.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of the DOJ's Antitrust Division noted in an article on the "unusual" nature of the criminal subpoenas, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[37]

79.    As another legal commentator has recently noted,

The recent disclosure widens the DOJ's criminal probe into whether or not leading generic drug providers are colluding to artificially raise generic drug prices. According to data from the Centers for Medicare and Medicaid Services (CMS), more than half of all generic drug prices rose between June 2013 and June 2014, including 10 percent of all generic drugs doubling in price during that time. As the fourth largest generics producer in the world, at least prior to the Teva deal, Allergan is the largest company to be involved in the DOJ investigation so far.[38]

*Factors Increasing the Market's Susceptibility to Collusion*

80.    Publicly available data on the generic digoxin and doxycycline markets in the United States demonstrates that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high

---

[36] *See* http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/.
[37] *See* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.
[38] *See* http://www.legalreader.com/doj-subpoenas-allergan-as-generics-antitrust-probe-widens/.

degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) intercompetitor contacts and communication.

81.  ***Industry Concentration***. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

82.  In the United States generic digoxin and generic doxycycline markets, the number of competitors has dwindled, creating cartel conditions. The firms that currently control most of the market are the Defendants. A graphic available at the website of one pharmacy benefits manager ("PBM")[39] reflects this development with respect to the market for generic digoxin:



83.  As the PBM goes on to explain:

> Overall, a grand jury is investigating the generic pharmaceutical industry as a whole for possible violations of anti-trust laws. More specifically, in early November 2014, the U.S. Department of Justice issued subpoenas to two generic drug makers seeking information about their interactions with competitors. In particular, these two companies are involved in the digoxin market, which has come in for scrutiny for obvious reasons.

---

[39] *See* https://www.optum.com/thought-leadership/whatcanbedone.html.html.

(Footnote omitted).

84.    Likewise, the 2015 Lannett Presentation and Bedrosian's public statements indicate that Impax, Par, and Mylan are its only serious competitors in that market.

85.    The number of meaningful competitors in the generic doxycycline market is also limited largely to five major players, as described above.

86.    ***Barriers to Entry***. Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

87.    Here, there are significant capital, regulatory and intellectual property barriers to entry in the generic digoxin and doxycycline markets.  For example, Par's own 2015 Form 10-K (cited above) states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."

88.    Costs of manufacture, coupled with regulatory oversight, represent a substantial barrier to entry in both the generic digoxin and doxycycline markets. This is reflected in West-Ward's having to temporarily shut down its New Jersey production facility for digoxin and spend $39 million in remediation.

89.    Intellectual property costs can also be substantial, as reflected in Par's digoxin licensing deal with Covis and Lannett's licensing arrangement with JSP.

90.    With respect to generic digoxin, entry has occurred on a limited basis, as reflected, *inter alia*, by the actions of Par and Mylan. But that entry has not curbed the

price fixing in the industry. Indeed, as noted above, Bedrosian regards both companies as "rational" competitors more interested in higher profits on fewer sales than grabbing market share through price competition.

91.    ***Demand Inelasticity***. Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life. In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining revenues and profits.

92.    Generic digoxin is critical to the health of patients with cardiovascular disease; it is considered a medical necessity that must be purchased at whatever cost the Defendants offer it for sale.

93.    Thus, generic digoxin and generic doxycycline are subject to cartelization because price increases will result in more revenue, rather than less.

94.    ***Lack of Substitutes.*** For some patients there are no effective substitutes for digoxin; as noted above, digoxin is on the WHO's list of essential medicines. The same is true for doxycycline for persons with a variety of health conditions.

95.    ***Standardized Product with High Degree of Interchangeability.*** A commodity–like product is one that is standardized across suppliers and allows for a

high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and it is easier to monitor these prices effectively. Here, the generic digoxin and/or generic doxycycline made by the Defendant manufacturers are each chemical compounds composed of the same raw materials; indeed, Bedrosian has commented that the Defendants use many of the same suppliers.  Customers may have no way of even knowing which manufacturer produced the generic digoxin and/or generic doxycycline they purchase.

96.   ***Absence of a Competitive Fringe of Sellers.*** Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at a lower, more competitive price. This reduces revenue and makes sustaining a conspiracy more difficult. In the market for generic digoxin, there is no realistic threat that a fringe of competitive sellers will take market share from Defendants. The Defendants in the respective markets for generic digoxin and generic doxycycline have oligopolistic power over those markets, which facilitates their ability to raise prices without losing market share to non-conspirators.

97.   ***Intercompetitor Contacts and Communications.*** In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other. Here, the Defendants are members of or participants in the GPHA, which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of

generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[40] Thus, representatives of the Defendants have opportunities to meet and conspire at functions of this group, as well as at industry healthcare meetings. In addition, as noted above, Lannett's Bedrosian has made positive assertions about how Lannett and its competitors view the competitive landscape for generic drugs, and that none of them will compete on price for the foreseeable future. Such statements suggest intercompetitor contacts and communications. The grand jury subpoenas discussed above lend further support to the conclusion that intercompetitor communications occurred with respect to the pricing of generic digoxin.

98.    During the Class Period, Plaintiff and members of the Class purchased generic digoxin and/or generic doxycycline from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

99.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the class have been injured in their business and property in that they have paid more for generic digoxin and/or generic doxycycline than they would have paid in a competitive market.

100.  The unlawful contract, combination or conspiracy has had the following effects, among others:

    a.    price competition in the market for generic digoxin and generic doxycycline has been artificially restrained;

---

[40] *See* http://www.gphaonline.org/about/the-gpha-association.

b.      prices for generic digoxin and/or generic doxycycline sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

c.      purchasers of generic digoxin and/or generic doxycycline from the Defendants have been deprived of the benefit of free and open competition in the market for generic digoxin and generic doxycycline.

## CLASS ACTION ALLEGATIONS

101.  Plaintiff brings this action on behalf of itself and members of the proposed class under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic digoxin or generic doxycycline products from October 1, 2012 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, counties or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic digoxin or doxycycline products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic digoxin or doxycycline products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

102.  Plaintiff also brings this action on behalf of itself and members of the proposed class under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state

antitrust and unfair competition laws of the states listed below (the "Indirect Purchaser States")[41] on behalf of the following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States who purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic digoxin or generic doxycycline products from October 1, 2012 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, counties or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic digoxin or doxycycline products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic digoxin or doxycycline products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

103.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."

104.   While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are millions of members in each Class.

105.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with

---

[41] The "Indirect Purchaser States" consist of Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

respect to the Classes as a whole. Such questions of law and fact common to the Classes

include, but are not limited to:

     a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic digoxin and/or generic doxycycline and/or engaged in market allocation for generic digoxin and/or generic doxycycline sold by prescription in the United States;

     b.    The identity of the participants of the alleged conspiracy;

     c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

     d.    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

     e.    Whether the alleged conspiracy violated state antitrust and unfair competition laws, as alleged in the Second Count;

     f.    Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Third Count;

     g.    Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

     h.    The effect of the alleged conspiracy on the prices of generic digoxin and generic doxycycline sold in the United States during the Class Period;

     i.    The appropriate injunctive and related equitable relief for the Nationwide Class; and

     j.    The appropriate class-wide measure of damages for the Damages Class.

106.   Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic digoxin and generic doxycycline purchased indirectly from the Defendants and/or their co-conspirators.

107.   Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

108.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

109.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

110.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## COUNT I
### Violation of Section 1 and 3 of the Sherman Act
### (on behalf of Plaintiff and the Nationwide Class)

111.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

112.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3).

113.   The acts done by each of the Defendants in furtherance of their contract, combination, or conspiracy were authorized or done by their officers, agents, or employees while actively engaged in the management of Defendants' affairs.

114.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic digoxin and doxycycline.

115.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic digoxin and generic doxycycline.

116.   As a result of Defendants' unlawful conduct, Plaintiff and other indirect purchasers in the Nationwide Class have been harmed by being forced to pay inflated, supracompetitive prices for generic digoxin and generic doxycycline.

117.   Defendants' conspiracy had the following effects, among others:

a.      Price competition in the market for generic digoxin and generic doxycycline has been restrained, suppressed, and/or eliminated in the United States;

b.      Prices for generic digoxin and generic doxycycline provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.      Plaintiff and members of the Nationwide Class have been deprived of the benefits of free and open competition.

118.   Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic digoxin and generic doxycycline purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

119.   The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

120.   Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiff and the Damages Class)**

121.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

122.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic

digoxin and generic doxycycline in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

123.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic digoxin and generic doxycycline and to allocate customers for generic digoxin and generic doxycycline in the United States.

124.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or violations of the following state antitrust statutes.

125.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Arizona; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition in Arizona; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline in Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*. Accordingly,

Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

126. Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code Section §16720. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of generic digoxin and generic doxycycline at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic digoxin and generic doxycycline. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic digoxin and generic doxycycline. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for generic digoxin and generic doxycycline has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic digoxin and generic doxycycline provided by Defendants and their coconspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who

purchased generic digoxin and generic doxycycline directly or indirectly from Defendants and their co- conspirators have been deprived of the benefit of free and open competition in California. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct in California. As a result of Defendants' violation of Section 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

127.   Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, et seq. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic digoxin and generic doxycycline that were shipped by Defendants or their coconspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic digoxin and generic doxycycline in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially

inflated prices for generic digoxin and generic doxycycline in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

128. Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii

Revised Statutes Annotated §§ 480-4, et seq. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.

129.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

130.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free

and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

131.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat.

Ann. §§ 50-101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

132.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, et seq.) Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

133.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout

Michigan; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

134.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and

proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

135.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

136. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

137. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4)

Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq*.

138.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

139.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

140.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline

price competition was restrained, suppressed, and eliminated throughout New York; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline that were higher than they would have been absent the Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

141.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive,

artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

142.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01,

*et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

143.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

144.   Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout South Dakota;

(2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

145.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate

result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

146.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

147.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

148.   Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members

of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

149.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

**COUNT III**
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

150.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

151.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits on generic digoxin and generic doxycycline.

152.   Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Damages Class for generic digoxin and generic doxycycline manufactured by Defendants during the Class Period.

153.   Plaintiff and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment that:

a) The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as a representative of the Classes, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

b) That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

c) Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

d) Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

e) Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other

persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

f)  Plaintiff and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

g)  Plaintiff and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

h)  Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

i)  Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: April 13, 2016                    Respectfully submitted,

                                         By:/s/ Joshua H. Grabar
                                         Anthony J. Bolognese
                                         Joshua H. Grabar (JHG-1707)
                                         BOLOGNESE & ASSOCIATES, LLC
                                         1500 JFK Boulevard, Suite 320
                                         Philadelphia, PA 19102
                                         Tel: (215) 814-6750
                                         Fax: (215) 814-6764
                                         jgrabar@bolognese-law.com

                                         Heidi M. Silton
                                         Karen Hanson Riebel
                                         W. Joseph Bruckner
                                         Richard A. Lockridge
                                         Kate M. Baxter-Kauf
                                         LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                         100 Washington Ave. S., Suite 2200
                                         Minneapolis, MN 55401
                                         Tel: (612) 339-6900
                                         Fax: (612) 339-0981
                                         hmsilton@locklaw.com
                                         khriebel@locklaw.com
                                         wjbruckner@locklaw.com
                                         ralockridge@locklaw.com
                                         kmbaxter-kauf@locklaw.com

                                         Gary F. Lynch
                                         CARLSON LYNCH LTD
                                         PNC Park
                                         115 Federal Street, Suite 210
                                         Pittsburgh, PA 15212
                                         Tel: (412) 322-9243
                                         Fax: (412) 231-0246
                                         glynch@carlsonlynch.com

Jeffrey L. Kodroff
John A. Macoretta
Jonathan M. Jagher
SPECTOR ROSEMAN KODROFF &
WILLIS P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611